Boyer, Appellant, *v.* Boyer.

Argued November 16, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, and CARR, JJ. (ERVIN, J., absent).

262

*James C. Lanshe,* with him *Joseph F. Fruhwirth,* for appellant.

*Ernest F. Ritter,* for appellee.

OPINION BY WOODSIDE, J., March 20, 1957:

On August 27, 1952, Matthias J. Boyer filed a complaint seeking a divorce on the ground of indignities. Now, over 1600 days later, after nearly a *million words* have been written in the case, a final disposition of the matter is approaching.

In an action for divorce on the ground of indignities it is difficult to eliminate from the testimony as irrelevant anything either party did or said during the time they lived together as husband and wife, but counsel and master should devise some means of adequately presenting the necessary evidence without accumulating a record which requires more space than 14 volumes of this Court's Reports.

The master recommended that this divorce be refused, but the court below sustained the plaintiff's exceptions to the master's report, and granted the decree. We shall affirm the court.

It is incumbent upon us on appeal from a decree of divorce, except where there has been a jury trial, to review the testimony, and adjudge whether it sustained the complaint of the plaintiff. Neither the court

below nor this Court can escape the burden of a careful consideration of the evidence to ascertain if it establishes the statutory grounds for a divorce. The rule generally applicable to proceedings before a master or an auditor, that a finding of fact will not be disturbed except for manifest error, is not applicable to divorce cases. Nor do the findings of fact made by a judge have the same effect on appeal as a verdict of a jury: *McKrell v. McKrell,* 352 Pa. 173, 179, 42 A. 2d 609 (1945). We must examine for ourselves the testimony in cases heard without a jury and determine therefrom, independently of the findings of the master, or even the court below, whether in truth and in fact a legal cause of divorce has been made out.[1] *Nacrelli v. Nacrelli,* 288 Pa. 1, 5, 6, 136 A. 228 (1927); *Dash v. Dash,* 357 Pa. 125, 126, 127, 53 A. 2d 89 (1947); *Mendenhall v. Mendenhall,* 12 Pa. Superior Ct. 290, 298 (1900); *Hurley v. Hurley,* 180 Pa. Superior Ct. 364, 366, 119 A. 2d 634 (1956).

The master's report, although advisory only, is to be given the fullest consideration as regards the credibility of witnesses whom he has seen and heard, and in this respect his report should not be lightly disregarded. *Brown v. Brown,* 163 Pa. Superior Ct. 490, 493, 63 A. 2d 130 (1949); *Megoulas v. Megoulas,* 166 Pa. Superior Ct. 510, 512, 72 A. 2d 598 (1950); *Smith v. Smith,* 157 Pa. Superior Ct. 582, 583, 43 A. 2d 371 (1945); *Green v. Green,* 182 Pa. Superior Ct. 287, 126 A. 2d 477 (1956).

However, the master's advantage obtained through seeing and hearing the witnesses exists only where the findings depend upon the credibility of witnesses. A

---

[1] For the extent of review by the Supreme Court in appeals allowed from this Court see *Phipps v. Phipps,* 368 Pa. 291, 297, 81 A. 2d 523 (1951).

judge who reads the record can apply the law to the facts as easily as the person who saw and heard the witnesses. Here we can accept the findings of the master almost in their entirety, for he reached an erroneous conclusion, not because he believed the defendant and her witnesses, but because he failed to properly evaluate his own findings.

In the master's report he stated: "The Master believes the Plaintiff to be a sincere, honest man and his testimony worthy of belief. His witnesses also appeared to the Master to be sincere and honest in their testimony. On the other hand, the Master believes that the Defendant knowingly gave untrue testimony and in many instances her testimony was greatly exaggerated. The Master further believes that Violet Kovalesky was extremely biased and exaggerating in her testimony, and that to a lesser degree so was Helen Moyer and Mrs. Charnosky, as was also Robert Schweyer." (These last four named persons were defendant's witnesses.)

The master also stated that he "believes the defendant to be far more to blame for the unhappiness in and the failure of this marriage but that she was not guilty of a course of conduct which rendered the condition of the plaintiff intolerable and his life burdensome."

Furthermore, he found as a fact, "that the plaintiff is an innocent and injured spouse." There may be some question whether the plaintiff can be an "injured" spouse, as the term is used in the divorce law, without the defendant being guilty of indignities which have rendered the plaintiff's condition intolerable and his life burdensome, but a consideration of this would be a mere matter of semantics, and add nothing to an understanding of the principles of law which relate to this case.

Although the master reached an erroneous conclusion, his diligence is worthy of praise, for his report was the most thorough and complete we have ever reviewed. We are compelled to note, however, that the report would have been more masterfully done had he, in relating the testimony, blown away the chaff rather than microscopically examining and reporting upon each bit of it.

The parties were married August 16, 1913, and lived together as husband and wife until November 14, 1947. They had one child, a daughter, now married to Robert Schweyer. The plaintiff is in his late sixties and the defendant in her late fifties.

The defendant had an affair with Larry Tierney. She received endearing letters from him; saw him frequently; apparently gave him money and her picture; asked her husband to employ him; and generally associated with him in a manner which justified suspicion and caused the plaintiff embarrassment.

On August 15, 1936, the plaintiff with a police officer entered the home of one of the defendant's friends in Slatington, at 2 o'clock in the morning, and found the defendant nude, in bed with Tierney. A charge of disorderly conduct was filed against the defendant, but subsequently dropped upon her plea for forgiveness and her promise not to see Tierney again.

In a divorce case evidence of an act of adultery by one of the parties is relevant and material to an issue of indignities. Even though adultery and cruel and barbarous treatment are separate grounds for divorce, evidence concerning them is admissible in an indignities case upon the theory that the greater offense is material evidence of the lesser charge. *Phipps v. Phipps*, 368 Pa. 291, 81 A. 2d 523 (1951); *Zonies v. Zonies*, 151 Pa. Superior Ct. 317, 321, 322, 30 A. 2d

193 (1943) ; *Blansett v. Blansett,* 162 Pa. Superior Ct. 45, 48, 56 A. 2d 341 (1948).

Having condoned the adultery the plaintiff is not entitled to a divorce on that ground, but condonation is not a bar to an action based upon indignities to the person. *Nixon v. Nixon,* 329 Pa. 256, 269, 198 A. 154 (1938) ; *Hollister v. Hollister,* 6 Pa. 449, 452, 453 (1847) ; *Koch v. Koch,* 62 Pa. Superior Ct. 607, 611, 612 (1916).

As stated by Justice JONES (now Chief Justice) in *Phipps v. Phipps,* supra, pages 295, 296, "Obviously, one act of adultery is insufficient to sustain a charge of indignities even though the offense, of itself, is adequate ground for divorce on an appropriate charge. Other misconduct of the respondent, as testified to, tending to prove indignities but which might have been extenuated as mere indiscretions or discounted as the imaginings of an overly suspicious or jealous spouse assumes its true import when pondered against the background of the respondent's deliberate and flagrant unfaithfulness to the libellant. Thus, the evidence as a whole becomes capable of constituting, as a matter of law, indignities to the person of the libellant rendering his condition intolerable and his life burdensome which is to be determined objectively."

The defendant's promise to her husband not to again see her lover meant nothing. She was found in his company by the plaintiff at the Seagreaves Hotel on August 26, and at another hotel on August 28. She admitted seeing Tierney at least once a week until January, 1937. The defendant subsequently associated with other men in public before her separation from her husband, as for example drinking at a table with a bartender. These associations may have been innocent and devoid of any wrongdoing, but in the light of

her affair with Tierney, they were annoying and embarrassing to the plaintiff, and constituted additional indignities.

There was testimony concerning the defendant's frequent and suspicious association with a male companion after she and her husband had separated. There was also evidence concerning the plaintiff's association after the separation with a female companion, which the master properly found to be free from fault.

Where the cause of divorce has fully accrued prior to the plaintiff's alleged misconduct, and where it did not provoke the indignities of which he complains, such misconduct would not be cause for refusing the divorce. *Clark v. Clark*, 160 Pa. Superior Ct. 562, 566, 52 A. 2d 351 (1947). The conduct of the defendant after the separation is admissible, but not as an indignity. *Phipps v. Phipps*, supra. Evidence of the conduct of the parties after separation is relevant for the purpose of shedding light upon their behavior prior to the separation.[2] *Orsuto v. Orsuto*, 171 Pa. Superior Ct. 532, 538, 91 A. 2d 284 (1952); *McMahon v. McMahon*, 167 Pa. Superior Ct. 51, 54, 74 A. 2d 718 (1950); *Philo v. Philo*, 154 Pa. Superior Ct. 563, 567, 36 A. 2d 833 (1944); *Hewitt v. Hewitt*, 136 Pa. Superior Ct. 266, 275, 7 A. 2d 45 (1939).

The defendant drank intoxicating beverages to excess. Numerous times she came home in a taxi when she could hardly walk, and at times had to be led to the apartment by the taxi driver. Once she was found drunk lying in the hallway, and had to be carried up

---

[2] Considering the limited effect of the parties' conduct after separation upon the case, the hundreds and hundreds of pages of testimony and discussion devoted to this were scarcely justified. Although admissible, the evidence was unduly detailed, and repetitious.

the steps to her home. She frequently cashed checks (eleven in one month) at a cafe at which she drank. Once she was taken to the hospital as a result of her drinking. The plaintiff, who was opposed to drinking, found many liquor and beer bottles hidden in the apartment. The master found as a fact that the defendant drank to excess and that it embarrassed the plaintiff, but felt it was not frequent or regular enough to entitle the plaintiff to a divorce. Her excessive use of alcoholic beverages, particularly in the light of the plaintiff's attitude toward drinking, constituted an indignity.

The plaintiff was a very religious man, and suffered insults and ridicule from his wife because of his church activities. Judge KOCH, in a well considered opinion, made the following pertinent observation: "Another of the major causes of difference between the parties revolved about the religious beliefs of the plaintiff. There can be little question that the plaintiff is a devoted Christian Scientist. His contributions to the church as well as his regular attendance at its functions were not regarded by the defendant in a reasonable light. The record is clear that the plaintiff was ridiculed and humiliated by his wife because of his beliefs and attempts by her to show indecent relationships with some of the women of the church were without foundation."

When the plaintiff arrested one of his tenants for hitting him over the head so severely that he required hospital treatment, the wife went to the hearing with the person who hit her husband and spoke against her husband with, what the alderman termed, an "outburst". On another occasion when the plaintiff attempted to evict a tenant, she openly sided with the tenant against her husband. Defendant frequently stayed out until one or two o'clock in the morning,

sometimes all night, without telling her husband where she had been. She pulled his hair because she thought he was playing the radio too loud. Without first consulting her husband, she had a lawyer write to him concerning the improper registration of the fictitious name of his business. These represented a series of incidents which together constituted a course of conduct making life burdensome.

The financial transactions between the parties demonstrate the defendant's attitude toward her husband. The plaintiff owned a coal business which he transferred to his wife during the depression in order "to save that if I should go into bankruptcy." The business and the income was to be used "for the family". The wife received the income from the business and, until after she was found in bed with Tierney, refused repeated requests to transfer back to her husband even a half interest in this business.

The plaintiff made the transfer to defeat the rights of creditors, and he is deserving of little sympathy for his subsequent plight. The issue here, however, is the wife's conduct toward her husband and not the plaintiff's conduct toward his creditors. Concerning this the master properly said: "When the plaintiff subsequently asked the defendant to reassign the interest back to him, she was morally obligated to do so, and the refusal to do so was a violation of the trust plaintiff placed in her."

The "last straw" came through another financial transaction. The plaintiff had owned and developed a business which was incorporated as the "Rotary Clothes Dryer". Plaintiff made a gift of 27 shares of the stock to his daughter, 27 to his son-in-law, and 51 to his wife. He retained 95 for himself. The wife along with the children thus held a majority of the

stock and together they were able to control the corporation. Ultimately they removed the plaintiff from active participation in the business, and appropriated the profits to their own use. To accomplish this the wife used against her husband the stock which he had given her. When the plaintiff was finally separated from the business through the removal of the office belongings, the defendant laughed at her husband, and joked about him. This was the final humiliation. The plaintiff then left his wife.

There is evidence that while the parties were living together the plaintiff's health was impaired. This is strong supporting evidence of indignities. *Williams v. Williams,* 180 Pa. Superior Ct. 114, 117, 118 A. 2d 591 (1955).

This action was brought under "The Divorce Law" of May 2, 1929, P. L. 1237, which provides in section 10 that ". . . it shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, whenever it shall be judged, in the manner hereinafter provided, that the other spouse: . . . (f) Shall have offered such indignities to the person of the injured and innocent spouse, as to render his or her condition intolerable and life burdensome;" 23 PS §10.

It is impossible to lay down any general rule as to what constitutes such indignities to the person as to render the condition of the injured spouse intolerable and life burdensome; such matters necessarily depend upon all the circumstances of the particular case and the position in life, character, and disposition of the parties. *Hewitt v. Hewitt,* supra.

A single act or an occasional isolated incident does not entitle a spouse to a divorce on the ground of indignities. The law requires such a course of conduct or continued treatment as renders the plaintiff's condi-

tion intolerable and his life burdensome. *Esenwein v. Esenwein,* 312 Pa. 77, 79, 167 A. 350 (1933) ; *Richards v. Richards,* 37 Pa. 225, 227 (1860).

An indignity to the person is said to be an affront to the personality of another, a lack of reverence for the personality of one's spouse. The offense is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement. *Trimbur v. Trimbur,* 171 Pa. Superior Ct. 541, 546, 91 A. 2d 307 (1952) ; *Paterson v. Paterson,* 178 Pa. Superior Ct. 615, 620, 115 A. 2d 919 (1955).

Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement. *McKrell v. McKrell,* supra.

The burden of proving his case by clear and satisfactory evidence is upon the plaintiff, and there must be a preponderance of the evidence in his favor. *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 308, 181 A. 69 (1935) ; *Holbrook v. Holbrook,* 160 Pa. Superior Ct. 129, 136, 50 A. 2d 709 (1947).

It is our opinion that the plaintiff met the burden of establishing by a preponderance of the evidence that his wife offered such indignities to his person as to render his condition intolerable and life burdensome; that he is the innocent spouse, and that he is entitled to a divorce.

Decree affirmed.